IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BOBBY CLARK, LAVINA M.
CLARK, TIM AND ELVIRA
MARTIN, on behalf of themselves
and all others similarly situated,

      Plaintiffs,

v.                                                                                       No. CIV 96-0141 LCS/LFG

GALLUP AUTO SALES, INC.,
doing business as FRIENDLY
MOTORS; MONTANA MINING,
INC.; and JERRY EGELAND,

      Defendants.

## THE COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW ON THE ISSUE OF PIERCING THE CORPORATE VEIL

### Findings of Fact

1.    At all times material herein, Gallup Auto Sales, Inc., a New Mexico corporation, (hereinafter GAS), was in the business of selling used vehicles in San Juan County, New Mexico and essentially all of the retail installment contracts generated by these sales were sold to Montana Mining, Inc., a New Mexico corporation (hereinafter MMI).

2.    GAS filed for protection under the bankruptcy code in April of 1999.

3.    MMI filed for protection under the bankruptcy code in April of 1999.

4.    At the time GAS filed for bankruptcy, it was a duly organized New Mexico corporation in good standing with the Public Regulation Commission.

5.	At the time MMI filed for bankruptcy, it was a duly organized New Mexico corporation in good standing with the Public Regulation Commission.

6.	At all times material herein, Defendant Jerry Egeland was the sole shareholder and principal operating officer of both GAS and MMI. Mr. Egeland is the sole shareholder and president of both GAS and MMI.

7.	Both MMI and GAS operated from the same building located at 431 E. Main in Farmington, New Mexico

8.	Both MMI and GAS shared the same telephone numbers and telephone system.

9.	Mr. Egeland was the sole signatory on the checking accounts at GAS.

10.	MMI started financing motor vehicle sales in 1991 and financed automobiles that GAS sold.

11.	About 95% of the sales by GAS are financed by MMI.

12.	MMI never obtained a license from the State of New Mexico to operate as a motor vehicle sales finance company.

13.	On February 2, 1999, MMI was financing 295 motor vehicle sales finance contracts with a current balance totaling $2,281,822.20, and total balances of $3,118,362.00.

14.	Mr. Egeland used corporate funds and employees to work on his own home without any accounting therefor.

15.	No corporate minutes, nor corporate resolutions, exist for either corporation.

16.	The corporations of MMI and GAS do not hold formal annual meetings, issue stock, or conduct their business by written resolution.

17. Not until April 5, 1999, did Thomas Solga, the CPA for MMI, prepare the 1995, 1996, and 1997 corporate income tax returns for the corporation. The returns were never filed with the Internal Revenue Service.

18. No federal corporate income tax returns even were prepared for GAS for 1995, 1996, and 1997.

19. MMI treated GAS differently from the arms-length relationship it used with other dealers who sold motor vehicles.

20. MMI, GAS and Mr. Egeland used the same mailing address.

21. Mr. Egeland was unable to identify which employees worked for GAS and which one worked for MMI and believes that all of them "worked for me."

22. Mr. Egeland commingled the assets of the corporations with his own. Mr. Egeland used MMI and GAS corporate funds to pay his personal debts for many years, through April, 1999.

23. Mr. Egeland did not take a salary from either MMI or GAS.

24. MMI and GAS did not issue a form 1099 to Mr. Egeland for any of the years in which the corporation paid these personal expenses related to Mr. Egeland's homes.

25. Maxine Harris gave cash from both corporations' receipts to Mr. Egeland in between weekly bank deposits.

26. Mr. Egeland treated the cash received and checks made out to the corporation as if they were his personal funds.

27. A federal court jury rendered a verdict in the approximate amount of $669,000.00 against MMI and GAS on January 27, 1999 in the case styled *Lee, et al. v. Gallup Auto Sales, et al.,* and numbered CIV 96-1525 WWD/LCS.

28. Mr. Egeland invested funds from both corporations and personal funds in Little Louie's Auto Sales, (hereinafter LLAS) without any written agreement as to whether his investment was a loan or equity.

29. There is no credible evidence to believe that LLAS was under the control of Mr. Egeland.

30. LLAS was not a "shell" for Mr. Egeland or his corporations.

31. Mr. Egeland invested in LLAS using funds from his corporations but he intended his investment to be personal. This is another example of Mr. Egeland not recognizing the separate corporate identity of the corporations.

32. MMI sold to Diana Beebe 142 accounts valued at almost a million dollars, for $200,000.00, which represented 20% of the value. The total value was calculated as the present payoff, without future interest. This was the fair market value of these accounts.

33. Beebe had no written agreement with MMI, GAS, or Mr. Egeland about the purchase of these accounts.

34. MMI paid many of the operating costs for LLAS, including rent and services performed by employees. This was part of the "Egeland Investment." This is another example of Mr. Egeland mixing his personal finances with those of the two corporations.

35. Although the investments in and the running of LLAS seem suspect, the Court finds that neither Mr. Egeland, MMI, nor GAS were alter-egos of LLAS. They were investors or lenders only.

36. Mr. Egeland personally directed employees of his corporations to do work for LLAS. This is still another example of Mr. Egeland's not keeping the corporate identities separate from his own.

37. Mr. Egeland personally bought vehicles for GAS and treated those vehicles and their proceeds as corporate or personal assets. He did not differentiate between himself personally and as an agent on behalf of the corporation. Checks were made payable to Mr. Egeland personally and yet endorsed by GAS.

38. The accounts sold by MMI to LLAS are the property of LLAS. Although the transaction was tainted by Mr. Egeland's treatment of these assets as his own, the sale to LLAS was at arm's length and for full value.

39. Neither GAS nor MMI kept a double-entry set of books. In fact, few records were kept that would ordinarily be kept by a corporation. Neither corporation timely filed tax returns or corporate reports with the appropriate governmental entities.

40. Checks made out to MMI and GAS were endorsed by Mr. Egeland personally and cashed at LLAS. (Ex. 33.)

41. Checks were made out to the Mr. Egeland, doing business as Frontier Motors of Farmington, for vehicles he owned personally, yet endorsed by GAS. (Ex. 47; *see also* Tr. at 124-130.)

42. There exists no formal documentation evidencing Mr. Egeland's loans to MMI, nor are there corporate resolutions approving the same.

43. Loans to MMI by Ms. Cervantes, Mr. Egeland's companion, were not evidenced by any book entry nor approved by and resolution on behalf of the corporation.

44. Mr. Egeland considered the accounts owed by MMI to be *his* accounts.

45. MMI was chartered as a jewelry wholesale business. The company's balance sheet of October 15, 1998 showed assets of $94,371.00 in inventory jewelry.

46. Nizhoni Moses Ltd., a gallery in Albuquerque's Old Town, transacted business with MMI. However, Nizhoni Moses made payments to Mr. Egeland personally instead of to MMI.

47. Thomas Hynes (Hynes, Hale & Gurley) was attorney of record in the *Lee* case, in which a jury rendered a $669,000.00 verdict against GAS and MMI.

48. Mr. Hynes' billings did not distinguish between Mr. Egeland, MMI or GAS, who were co-defendants.

49. MMI stopped making payments to Mr. Hynes after August 7, 1998. Mr. Hynes continued working for Mr. Egeland and his companies in *Lee*, in this case, and in several other cases.

50. From May, 1998 through March, 1999, MMI wrote nine checks to Mr. Egeland or to itself, which Mr. Egeland cashed, in the amount of $63,209.90.

51. There is no written documentation concerning the use of the $63,209.90.

52. Mr. Egeland was the sole shareholder of both corporations and exercised total control over them.

53. Both corporations were used as the instrumentalities of Mr. Egeland personally.

54. Notwithstanding Mr. Egeland's use of the corporations indiscriminately of his personal business, the corporations were not undercapitalized. Even in bankruptcy, MMI and GAS have assets of between $500,000.00 and $1,000,000.00.

55. No fraud was perpetrated on the Plaintiffs or the class.

56. There was no intent by the corporations to evade any corporate liability, including Plaintiffs' claims.

57. Having listened to Mr. Egeland and observed his demeanor while testifying, the Court finds that he was not attempting to avoid Plaintiffs' claims. Mr. Egeland does not share in any moral culpability or injustice.

58. Although Mr. Egeland disregarded the separation of the corporations, no injustice or inequity exists making it necessary to pierce the corporate veil.

59. There was insufficient evidence presented that the corporations were so undercapitalized as to impose an inequity or work an injustice on Plaintiffs. There is no credible evidence that any alleged unfairness to the Plaintiffs outweighs the policy established by the legislature in creating the corporate fiction. To the contrary, the evidence presented indicated that there may be adequate funds within the bankrupt corporations to address Plaintiffs' claims. There was no indication that the corporations were set up to avoid payment to the Plaintiffs.

60. Plaintiffs have failed in their burden of convincing the Court of the second prong required to pierce the corporate veil.

## The Applicable Law[1]

The Tenth Circuit holds that a litigant must establish two elements in order to pierce the corporate veil. *See National Labor Relations Board v. Greater Kansas City Roofing*, 2 F.3d 1047, 1052 (10th Cir. 1993). First, the litigant must show that was there such unity of interest and lack of

---

[1] Federal law applies to this case as it is brought under the federal Truth in Lending Act. *See National Labor Relations Board v. Greater Kansas City Roofing*, 2 F.3d at 1052 (*citing Seymour v. Hull-Moreland & Assoc., Inc.,* 605 F.2d 1105 (9th Cir. 1979)(applying federal common law to issue of whether to pierce the corporate veil in case based on federal law). New Mexico law on the question of whether to pierce the corporate veil requires a showing of instrumentality or domination, improper purpose, and proximate causation. *See Scott v. AZL Resources*, 107 N.M.118, 121, 753 P.2d 897, 900 (1988). The New Mexico analysis is very similar to the federal test. For the purposes of this case, the application of New Mexico law would lead to the same result as the application of federal law.

respect given to the separate identity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct. *Id.* at 1052. Second, the litigant must establish that adherence to the corporate fiction would sanction a fraud, promote injustice, or lead to an evasion of legal obligations. *Id.* at 1052.

In determining whether the owner and the corporation have maintained separate identities, the court considers whether the corporation was operated as a separate entity, whether funds and other assets were commingled, whether adequate corporate records or minutes were kept, the nature of the corporation's ownership and control, the absence of corporate assets and undercapitalization, the use of a corporation as a mere shell, instrumentality or conduit of the an individual or another corporation, disregard of legal formalities and the failure to maintain an arms-length relationship among related entities, and diversion of the corporation's funds or assets to non-corporate uses. *See Greater Kansas City Roofing*, 2 F.3d at 1052 n.6. In addition, New Mexico law mandates that each New Mexico corporation must maintain correct and complete books, records of account and minutes of its shareholder meetings. NMSA 1978, §§ 53-8-27; 53-11-50 (A) (1999). Furthermore, all books, records and minutes must be kept in written form or in any other form capable of being converted into written form within a reasonable time. NMSA 1978, § 53-11-50 (A) (1999).

In order to satisfy the second element necessary to pierce the corporate veil, a litigant must establish an inequity flowing from misuse of the corporate form *See Greater Kansas City Roofing*, 2 F.3d at 1052-53. A showing that a corporation committed an unfair trade practice or tort, is not sufficient. *Id.* "It is only when the shareholders disregard the separateness of the corporate identity and when that act of disregard causes the injustice or inequity or constitutes the fraud that the corporate veil may be pierced." *Greater Kansas City Roofing*, 2 F.3d at 1053 (*citing Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R.*, 417 U.S. 703, 713, 94 S. Ct. 2578, 2584, 41 L. Ed.2d

418 (1974)). The mere fact that a creditor remains unpaid is insufficient for a finding of injustice. *Greater Kansas City Roofing*, 3 F.3d at 1053 (*citing Scarbrough v. Perez*, 870 F. 2d 1079, 1084 (6th Cir. 1989). A party seeking to pierce the corporate veil must show that the investment incentive established by the corporate veil is outweighed by the competing value of basic fairness to the parties dealing with the corporation. *Labadie Coal Co. v. Black*, 672 F.2d 92, 96 (D.C. Cir. 1982). There was no failure to adequately capitalize the corporation for the reasonable risks of corporate undertakings. *Id* at 99. Moreover, the person who is sought to be reached individually must have "shared in the moral culpability or injustice that is found to satisfy the second prong of the test." *Greater Kansas City Roofing*, 2 F.3d at 1053.

## Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter of this case.

2. Venue is proper in this district.

3. Mr. Egeland failed to maintain a separate corporate identity for MMI and for GAS. There was such unity of interest between Mr. Egeland and the corporations and that their personalities and assets were indistinct. The evidence presented by Plaintiffs satisfied the first element of the *Greater Kansas City Roofing* analysis.

4. Notwithstanding Mr. Egeland's use of the corporations indiscriminately for his personal business and the failure to keep adequate records, no injustice or inequity flowed from the misuse of the corporate form. There was no failure to adequately capitalize the corporations for the reasonable risks of corporate undertakings. Evidence presented by Plaintiffs failed to satisfy the second prong of the *Greater Kansas City Roofing* test. Plaintiffs have failed to meet their burden of proof in this regard.

9

5. The corporate entities of MMI and GAS should not be disregarded.

6. Mr. Egeland is not personally liable to Plaintiffs' for the claims asserted in this action.

**AN ORDER CONSISTENT WITH THESE FINDINGS OF FACT AND CONCLUSIONS OF LAW SHALL ISSUE.**

_____
**LESLIE C. SMITH
UNITED STATE MAGISTRATE JUDGE**